HARTMAN MARKOE

*v.*

MARY WAKEMAN *et al.*

*Filed at Ottawa March 28, 1883—Rehearing denied September Term, 1883.*

1. PARTITION—*when presumed, from acts of the parties.* A and B acquired title to a quarter section of land, in 1835, by an assignment of a certificate of purchase from the United States, and the patent was issued to them in 1839. On July 7, 1836, B signed a contract for the sale of the undivided half of the quarter to C, and on September 8, 1836, conveyed to C, in New York City, the east half of the quarter. Before the date of this deed A gave to B a power of attorney to sell the west half of the tract, which power of attorney B took with him to New York. On November 29, 1839, A went to New York, where he made a warranty deed to D for the west half of the tract, which he left with B until proper securities should be given. These deeds were all recorded in the proper county. A afterward learning that the securities were worthless, in 1838 filed his bill in the New York court seeking a rescission of his contract of sale, asserting his ownership of the west half of the quarter, and asking to be reinvested with the title. C, and those claiming the east half of the quarter under him, paid all the taxes thereon, A paying no part thereof, though residing in the same county, making no claim to such east half: *Held,* that from these and other facts, in view of the acquiescence of A for so many years, a partition of the land between A and B in 1836, by deed, would be presumed, if necessary, and that A was not entitled to a partition of the east half of the quarter.

2. In such case, the purchase from B of the east half of the tract after partition could not be affected by any fraud, actual or supposed, by B, in delivering A's deed for the west half upon worthless security.

3. TENANTS IN COMMON—*of their rights as to a specific part of an entire tract.* A patent to two persons as tenants in common of a quarter section of land, clothes each with title to the undivided half of the entire quarter. It does not give to either an undivided half of any specific part of the entire quarter, nor the right to have partition of any specific part, except in case of a sale of the residue by both tenants, or by some act of the parties, or by proceedings at law.

4. SAME—*purchaser from one of the co-tenants—of his rights as against the other.* A conveyance by one co-tenant gives the grantee no greater rights than those held by the grantor. An undivided interest in a specific part of a single tract of land held by co-tenants as an integer, acquired by them through one deed, can not be granted by the mere deed of one co-tenant, so as to entitle the grantee, as against the other co-tenant, to have that specific part of the entire tract partitioned between them.

5. RECORDING OF DEEDS—*constructive notice—as to conveyances by tenants in common.* Where each of two tenants in common has made a warranty deed, one for the east half of the tract owned by them, and the other for the west half, which deeds are recorded, the record will afford constructive notice to a person subsequently purchasing of either an interest in the part conveyed by the other, sufficient to put him on inquiry as to the fact that a partition had been made by the tenants in common before their several conveyances.

APPEAL from the Superior Court of Cook county; the Hon. GEORGE GARDNER, Judge, presiding.

Mr. VAN H. HIGGINS, and Mr. JOHN WOODBRIDGE, for the appellant:

To pass the title under a parol partition there must be possession under it sufficiently long to justify the presumption of a deed, when a court of equity will compel from the co-tenant a deed, and protect the possession until a conveyance is decreed. *Tomlin* v. *Hilliard,* 43 Ill. 302; *Nichols* v. *Padfield,* 77 id. 257; *Larrabee* v. *Strobel,* 89 id. 381; *Vasey* v. *Board of Trustees,* 59 id. 190.

In Massachusetts, Pennsylvania and Maine it is held that no partition by the parties can be effected unless accompanied by deeds from one co-tenant to the other. It is not sufficient that each co-tenant convey to a stranger, as is the case in Wisconsin. *Gardner Manf. Co.* v. *Heald,* 5 Maine,

232; *Wood* v. *Leet*, 36 N. Y. 504; *Porter* v. *Hill*, 9 Mass. 34; *Porter* v. *Perkins*, 5 id. 232; *Snively* v. *Luce*, 1 Watts, 69; *Gratz* v. *Gratz*, 4 Rawle, 411.

If Markoe had united with Shepard in the deed to Wakeman, and the latter had sold to a third person, then Markoe would be estopped from showing that his subsequent deed to Reid was obtained by fraud. But such is not the case. The deed to Reid did not exist when Wakeman bought from Shepard, and being out of the chain of Wakeman's title, can neither benefit nor injure him.

Actual possession was not taken until after the filing of the petition for partition. This was a proceeding *in rem*. *Louvalle* v. *Menard*, 1 Gilm. 43; *Hopkins* v. *Medley*, 97 Ill. 402.

In a proceeding *in rem* the filing of the petition is a *caveat* to all the world. *Sherman* v. *Bank*, 101 U. S. 105.

Messrs. DENT & BLACK, for the appellees:

The facts show that there was at least a parol partition of the land between Markoe and Shepard, the former taking the west half and the latter the east half. It is the well settled doctrine, at least in some courts, that a parol partition of land between tenants in common, carried into effect by possession taken by each party of his part, will be binding on the parties, as their titles are distinct, there being but a unity of possession, and the object of the division being to ascertain the separate possession of each. *Jackson* v. *Harder*, 4 Johns. 202; *Wood* v. *Fleet*, 36 N. Y. 499; *Eaton* v. *Tallmadge*, 24 Wis. 217; *Tomlin* v. *Hilliard*, 43 Ill. 300; *Vasey* v. *Board of Trustees*, 59 id. 188.

The cases cited do not hold that a partition suit is a proceeding *in rem*, in a technical sense. There is nothing in the nature of a proceeding *in rem* in a suit for partition. Until the parties in interest are brought into court the petition is not *lis pendens* as to them.

Mr. JUSTICE DICKEY delivered the opinion of the Court:

This is a petition for partition, filed by Hartman Markoe, in the Superior Court of Cook county, December 6, 1870, claiming to be the owner in fee of the undivided half of eighty acres of land, known as the east half of the south-east quarter of section 27, township 38, range 14, and lying a few miles south of the present city of Chicago. The entire quarter section, containing one hundred and sixty acres, was originally entered at the land office of Chicago by Herman Bond, on June 27, 1835. On December 4, 1835, Bond, by an instrument in writing filed in the land office, sold and assigned his certificate of purchase and his interest in the land to Edward Shepard and Hartman Markoe, the petitioner, and requested that the patent issue to them. The patent was issued to Shepard and Markoe, as tenants in common, on October 1, 1839. Before that time, Shepard (September 8, 1836,) had sold and conveyed, by deed and warranty of title, to Maurice Wakeman the *whole* of the east half of that quarter section. Wakeman was dead before the petition was filed, and by amendment the heirs and grantees of Maurice Wakeman were made defendants. Those claiming under Maurice Wakeman claim title in fee to the *whole* of the tract of land known as the east half of the quarter, by their answer to the petition, and also by a cross-bill, asking that the title thereto be confirmed in them. Markoe, and those claiming under him through conveyances made after the partition suit was brought, but before answer and cross-bill filed, claim to own the undivided half of the tract, known as the east half of this quarter.

A careful examination and consideration of all the documents and other proofs in the case lead clearly to the conclusion that at some time between the 7th of July, 1836, and the 8th of September of the same year, Shepard and Markoe, being the owners in common of the entire quarter section,

containing one hundred and sixty acres, each owning an undivided half thereof, did make partition thereof between themselves, whereby Markoe became the owner in fee of the west half of the quarter, and Shepard became the owner in fee of the east half of the quarter, and shows that Markoe was thereby divested of all interest in or title to the east half,—the undivided half of which he and his grantees now claim. The proof of this seems very satisfactory, although the same is chiefly circumstantial.

When the certificate of purchase was assigned by Bond to Shepard and Markoe, December 4, 1835, Shepard was a partner in business of one Breese. Their store was in Chicago, which at that time was a small town. Markoe was a book-keeper and principal clerk in the service of the firm of Breese & Shepard. Markoe and Shepard were both residents of Chicago, and roomed together in a room over the store, and were very intimate friends. They thus dwelt together until Shepard moved to New York City, in the summer or fall of 1836. Shepard had money with which to buy lands, but Markoe had none. Shepard, under an arrangement between him and Markoe, (made upon the suggestion of Shepard, as a professed act of friendship to Markoe,) paid the whole of the price of the land to Bond, and Markoe was charged on the books of Breese & Shepard, in account against his salary, with one-half of the purchase money. Shepard kept all the papers relating to the purchase, and was relied upon by Markoe to make sale of Markoe's interest for him. In July, 1836, Maurice Wakeman, of New York City, being in Chicago, on the 7th day of that month signed a contract in writing with Shepard, for the purchase from Shepard of Shepard's interest in some thirteen different tracts of land, and, among others, Shepard by that writing contracted to sell to Wakeman *the undivided half* of the whole of the quarter in question. At that time evidently no partition of the land had been made between Markoe and Shepard. By that con-

tract of July 7, 1836, the deeds from Shepard to Wakeman were to be made "on the arrival of Shepard" in the city of New York. Shepard did go from Chicago to New York in the summer of 1836. Markoe gave to Shepard, when he was about starting to New York City, a power of attorney authorizing him to sell for Markoe, not the *undivided half* of this quarter, but the *west half* of the same. This is shown by the statements in Markoe's bill in chancery, hereafter spoken of.

This indicates pretty clearly that after Shepard's contract of July 7, 1836, with Wakeman, and before Shepard went on to New York, a partition of this quarter had been made between them, by which Markoe had come to claim the exclusive right to the *west half*, instead of the *undivided half* of the whole quarter. Not only so, but we find Shepard, in fulfillment of his contract with Wakeman, (made July 7, 1836, and by which he agreed to convey the undivided half of this quarter,) makes, on September 8, 1836, a warranty deed, conveying to Wakeman, not the *undivided half* of the quarter, but the *east half* of the quarter. He then had in his possession the power of attorney from Markoe authorizing him, as his agent, to sell the *west half* as Markoe's separate property, and probably had also with him the deed of partition.

In further proof that such partition had been made, we may note that James Grant, an attorney at law in Chicago, and familiar with the nature and evidence of title to real estate in Chicago, surpervised for Wakeman, as his attorney, the exchange of properties between Shepard and Wakeman, and Wakeman, with full knowledge that on July 7, 1836, Shepard claimed the *undivided half* of that quarter, did, on the 8th of September, 1836, under the advice of Grant, accept from Shepard, in lieu thereof, a deed for the *east half* of the quarter. There must, at that time, have been extant some evidence of such a partition. It may have been, and probably was, made, with Wakeman's consent, after the contract of July 7, 1836, and before Wakeman left Chicago for

New York City. Further in support of the view that such a
partition was in fact made about that time, we find Markoe
in New York City on November 29, 1836, when and where
he signed, sealed and acknowledged a deed of that date con-
veying the *west half* of the quarter section to Reid, and cove-
nanting that he owned the same in fee simple.

From the fall of 1836 until the commencement of this suit
in 1870, a period of more than thirty-four years, Markoe, so
far as the proof shows, never, by word or act, claimed to
have any interest in or title to the *east half* of this quarter
section. Not only so, but while Markoe still lived in Chicago,
having discovered that the securities which he accepted as
the consideration for his deed to Reid for the west half of
this quarter were, as he says, absolutely worthless, he went
to New York City, and instituted there a suit in chancery, on
the 10th day of July, 1838, to set aside the sale to Reid and
re-invest himself with the title to the entire west half of this
quarter. In that bill he charges that on and before the 29th
of November, 1836, he was seized in fee of the *west half* of
this quarter section, containing eighty acres; that he had
given to Shepard, who was then in Chicago and *about to go
to New York,* a power of attorney to sell this tract (the *west
half* of this quarter) and another tract lying in Illinois. He
states the time of giving this power of attorney as "about
the month of June," 1836, but as it is evident Shepard did
not go on to New York until after this contract with Wake-
man of July 7, 1836, it seems plain this power of attorney
was not given until after the 7th of July, 1836. His bill
further states, that the deed from him to Reid was executed
by him and left in New York, in Shepard's hands, to con-
summate a sale for him (Markoe) of this *west half* of the
quarter in question, at the price of $3000, and the other
tract at the price of $4000,—in all, $7000,—and Shepard
was to accept a mortgage bond on property near Utica for
$7000 for the two tracts, and then sell the bond and forward

17—107 ILL.

the proceeds in money to Markoe, at Chicago. His bill further states that Shepard, instead of sending the money sent him a mortgage bond on property near Utica for the sum of $9000, instead of $7000; that this bond was assigned to Shepard and Markoe; and in explanation, Shepard advised him that he (Shepard) had sold not only these two tracts of Markoe, but also some land of his own (that is, Shepard's own land,) for $2000, so that Shepard owned $2000 of the $9000 bond, and the residue belonged to Markoe. With this statement Markoe seems to have been content, until, in 1838, he learned that the $9000 bond was absolutely worthless, and that Shepard had absconded, and gone to Europe. Not only does this bill assert, expressly, that at the time of the making of the deed, in November, 1836, Markoe owned the west half of this quarter in fee, but its whole tenor and drift absolutely repels the idea that Shepard still held an interest of an undivided half in that property, —which would have been the truth if no partition had been made between them,—and the prayer of the bill is, that the Reid deed be set aside, and that property therein mentioned be reconveyed to Markoe. That bill is said to be still pending, and by it Markoe, for over forty years, has been asserting the exclusive right to the *west half* of the quarter, and by it is still asserting that right, and, as said above, at no time after July, 1836, until this suit was begun, in 1870, has Markoe, by word or act, claimed any interest in the *east half* of this quarter. On the other hand, Maurice Wakeman, and those claiming under him, have been constantly, throughout all these years, claiming to own in fee the entire *east half* of this quarter, and this under the deed of Shepard to Maurice Wakeman, September 8, 1836, which was duly recorded on the 14th of November, 1836, in Cook county. The tax books show this land listed from its first taxation in the name of Wakeman, and that the taxes were all paid, and the proof shows that through Ogden and his associates the Wakemans

paid taxes upon the *east half* of this quarter from 1847 to 1867, inclusive,—for twenty-one years,—and that in 1868 the agency was passed from the Ogdens to Andrews, and he claimed, for the Wakemans, control ever since. The proofs show that for some years after 1860, the Ogdens, as agents for appellees, gave leases, or written permits, to persons to cut hay from the ground, and that since Andrews took charge of the land he has put tenants upon the same. It further appears, that as early as 1868 persons claiming under Markoe, through Reid, had actual and exclusive possession of the *west half* of this quarter section, although it does not appear that this was with the consent of Markoe. Markoe, during all these years, made no attempt to pay taxes, either upon a specific half of this quarter, or upon an undivided half of the whole quarter, or upon the undivided half of either half.

In view of all these facts,—these proofs, affirmative and negative,—the mind is irresistibly borne to the conclusion that a partition of this land was, in fact, made between July 7, 1836, and September 8, 1836, by which Markoe was divested of all his interest in the *east half* of this quarter section. It is true Markoe swears no such partition was ever made, but he does not deny that he did make the deed to Reid; nor does he pretend that he ever bought any interest from Shepard, or that in any way other than by such partition he acquired the right to convey the *west half*. The relations of him and Shepard were such, in 1836, that he, no doubt, would have executed any paper which Shepard should have asked him to sign. The probability is, that when Shepard went to New York to fulfill his contract with Wakeman, and took with him Markoe's power of attorney authorizing him to sell for Markoe the *west half*, he, at the same time, took with him the deed of partition, and soon after, when he absconded and went to Europe, as Markoe says, he carried off with him both the power of attorney and the deed of par-

tition, and this accounts for the fact that neither the power of attorney nor the deed of partition was ever recorded; and in all these matters Markoe relied so fully upon and so trusted Shepard, that little impression was made upon his mind by these events, and so the making of the partition has escaped his memory.

Counsel for appellants reason learnedly, and refer to many authorities, upon the extent of the effect to be given to an oral agreement for partition. Without passing upon the questions of the law on that subject discussed, it seems clear that in a case like the present, after such acquiescence for so many years, from the facts stated a partition *by deed* should be presumed, if such a partition be necessary to that end.

But it is said that Markoe was induced to make his deed of November 29, 1836, to Reid, by fraud, to which Shepard was a party, and that as against Shepard, in equity, he is entitled to disregard that deed, and claim the undivided half of the *east half*, and inasmuch as the Wakemans can only prevail through the rights of Shepard, they must be treated as occupying the same position as Shepard would occupy were he the party in their stead. If we are right in our conclusion that a partition was actually made between Markoe and Shepard before September, 1836, by which Shepard became the owner in severalty of the *east half* of this quarter section, then, by the deed of Shepard to Wakeman, made September 8, 1836, and recorded November 14, 1836, Wakeman had the complete title to the east half of the quarter, and this title could not possibly be affected by any fraud or other act of Shepard done on November 29, 1836. Markoe, in his bill of 1838, does not claim that he was cheated in the partition, but only that he was afterwards cheated in the sale of what he acquired by the partition. The rights of Wakeman, and those holding under him, can not possibly be affected by the supposed fraud of Shepard.

It is said the National Life Insurance Company owns the undivided half of the *east half* of this quarter section "through a *connected chain* of title, with four links in the chain: First, the patent to Markoe and Shepard; second, Markoe's deed to Bogue; third, Bogue's deed to Cornell; and fourth, Cornell's deed to the National Life Insurance Company,"—and it is said this title is not impeached. The fallacy in supposing that this shows a complete title, consists in assuming that by a patent granting the whole quarter section to Shepard and Markoe, Markoe thereby acquired such a title to the undivided half of the *east half* of the quarter as would enable him, in partition proceedings, to demand, as against Shepard, the right to have half of his (Markoe's) interest set off to him out of this east half. The patent clothed Shepard and Markoe, each, with title to the undivided half of the entire quarter section of one hundred and sixty acres. Markoe did not thereby acquire such title to the undivided half of the *east half* of the quarter, nor such title to the undivided half of any specific part of the entire quarter. The patent gave Markoe the right to have a portion of the whole quarter set off to him in severalty, equal in value to one-half the value of the whole quarter; but it did not give him right to have one-half of that portion taken from the east half, nor, indeed, the right to have any portion of his allotment taken from the east half. If, after the whole quarter was vested in Shepard and Markoe, so that Markoe had an undivided half of the whole, and Shepard had the other undivided half of the whole, Markoe ever acquired such full and *exclusive* title to the undivided half of the east half of the whole, and a lawful capacity to convey such a title to the same to Bogue, he must, of necessity, have acquired that right and title in some form from Shepard. He might have acquired such right by deed from Shepard conveying to him such right of title. He might have acquired that right by deed of partition between himself and Shepard, or by partition through pro-

ceedings in court, or by contract with Shepard creating out of the *one* co-tenancy in the whole, *two* co-tenancies,—one a co-tenancy of the west half, and one a co-tenancy of the east half,—or he might have acquired right and capacity to grant to Bogue such title in the undivided half of the *east half* by and through a sale and conveyance by both Shepard and Markoe of the west half to a stranger, or by a sale and conveyance by Shepard to Markoe of the undivided half of the west half of the tract, and perhaps by other acts or modes; but in no event could he acquire such title as he attempted to convey to Bogue, except by and from Shepard. It follows that Bogue can not have acquired the title he professed to buy from Markoe, except by and from Shepard and Markoe, both, hence he had constructive notice, by the record, of the deeds of Shepard to Wakeman, and of Markoe to Reid, each of said deeds being in the line of title he was buying, and these deeds were sufficient to put him on inquiry, which would have given him evidence that a partition had, in fact, been made, by which Markoe was divested of all title to the east half of the quarter. The rights of those holding under Markoe are, therefore, no higher than the rights of Markoe, and must yield to the prior rights of appellees.

In no case can the conveyance of one co-tenant give the grantee any greater rights than those held by the grantor. (Freeman on Partition and Co-tenancy, sec. 205.) As no such co-tenant can, of right, demand that a particular part of the estate held in common shall be set off to him on partition, so no grantee of such co-tenant can be held to have acquired that right. These principles do not necessarily apply where several separate tracts of land are held by two or more as tenants in common. Such holding, under certain circumstances, constitutes several co-tenancies. But where the co-tenancy relates to but *one tract of land, lying in a single body, acquired* at the *same time,* and by *one purchase* and *one grant,* wherein the whole tract is treated as *an integer,*

these views apply until *segregation* has been brought about by acts of the parties to be affected thereby, or by proceedings binding on them. Undoubtedly undivided interests in distinct freeholds may be sold separately by a co-tenant, so as to invest the grantee with the absolute title to an undivided interest in one freehold, and not in another held by his grantor and others; but an undivided interest in a *specific part* of a single tract of land held by co-tenants *as an integer*, acquired by them through *one deed*, can not be granted by the mere deed of one co-tenant, so as to entitle the grantee, as against the other co-tenant, to have that specific part of the entire tract partitioned between such grantee and the co-tenant from whom he did not purchase. (*Sutton* v. *San-Francisco*, 36 Cal. 112; *Bigelow* v. *Littlefield*, 52 Maine, 24; Freeman on Partition and Co-tenancy, sec. 508, *et seq.*) We are not to be understood as holding that such a conveyance is entirely inoperative or void, as seems to be the indication of some of the authorities. That question is not involved in this controversy. If it were, the writer of this opinion would say such a conveyance *is* not void, and might attempt to explain its legal effect; but here the discussion of that question is not required. What we hold in this regard is, that the conveyance of Markoe to Bogue, and the conveyances thereunder to the other appellants, give to none of them any standing, as against the appellees, better than the standing of Markoe himself.

The decree in this case is therefore affirmed.

*Decree affirmed.*